Our first case for argument this morning is Leader Communications v. the FAA. We'll let you hear from the appellant. Good morning, your honors. May it please the court. My name is Michael Smith and I'm an attorney at McAfee and Taft, and I have the honor of representing Leader Communications, Incorporated, in this appeal against the Federal Aviation Administration. This is the appeal involving the question of font size in the graphics, illustrations, and charts submitted to the FAA for procurement. In preparing for oral argument, I've really kind of boiled down to two exhibits or two pages from the agency record that demonstrate why the FAA's actions are arbitrary and capricious. I would direct the court's attention to pages 84 and 85 of the agency record, and I have those copies here if your honors would like to look at those in order to understand the oral argument that I'm making. Counsel for FAA has been provided those as well. Basically, on these two pages are two exhibits, one exhibit I and one exhibit J. They're both textual in nature, and yet the FAA has decided one of these is a graphic illustration or chart and one of them is not. Now, on appeal, the FAA defines these graphic illustrations and charts as something that is primarily pictorial rather than textual in nature. And if you look at these two exhibits, exhibit I and exhibit J, there is nothing pictorial about them. These are both charts that are primarily textual, contrary to the FAA's definition, and yet, according to the FAA, one of them is pictorial and one of them is not. One of them is compliant and one of them is not. Which one was compliant, according to your honor? Exhibit J on page 85 of the record was deemed compliant. Exhibit I on page 84 of the agency record was deemed noncompliant. How many were there? There were 17 total exhibits, your honor. Nine of them deemed compliant and eight of them deemed noncompliant. And all of these are contained in LCI's revised technical proposal, which is in the appendix of the agency record. Are you saying nine are on their face compliant or nine were deemed compliant by the FAA? Nine were deemed compliant by the FAA and eight of them were deemed noncompliant. And I implore the panel to look at those exhibits that were deemed compliant and ask yourself if any of those are pictorial, if any of those meet the definition that the FAA is offering to this panel to justify their exclusion or their termination of LCI. Before we get to that point, when your client was asked to revise and resubmit their bid, did they ask the agency what was wrong with their initial bid? Did they get specifics on what they were trying to correct? They did not ask for clarification, your honor. They were told that several sections contained text that was smaller than 12 point font and that was not a graphic illustration or chart and they had three days to turn it around and do a revised proposal. They took that three days and attempted to comply with how they understood the FAA's instructions. But they could have asked. I mean, you're saying now that it's ambiguous, we didn't know what to do. Well, if it was ambiguous and you didn't know what to do, why wouldn't you ask? Well, it only became ambiguous after the FAA told us that we didn't comply but didn't tell us how we didn't comply. But I'm saying when they didn't tell you how you didn't comply, you could have asked. They could have asked, yes, your honor, that is correct, but they did not. And if it's a patent ambiguity and you don't ask, don't you then waive your right to object? If it's patent, but this was a latent ambiguity. You're saying that when you read L.11 general SIR instruction that when they said the font for graphics, illustrations, and charts must be 8 point or larger, that graphics, illustrations, and charts is ambiguous. You don't know what it means. I mean, that's patent. There's no definition, and if that's ambiguous, you had an obligation to seek clarification. Correct. It's LCI's position that we did not think it was a patent ambiguity, and it became an ambiguity once the FAA said, no, you're not complying with the graphics, illustrations, and charts provision. And this also takes us back to the point that LCI had used this exact same procedure in bidding for contracts for the FAA and the Department of Defense and had never had an issue with this. And so through that understanding, it didn't seem ambiguous to them. Well, I thought that this new subsection, it was a new subsection, wasn't it? It was not anything that you had dealt with before. Is that right? That I don't know, your honor. I have not seen the prior. Well, I thought when you prevailed in the prior bid and then somehow you were asked to start over again, there was a new addition that is this very subsection that we're discussing that was added to the requirement for your bid submission. Is that not true? That I don't know, your honor. I do know that we've got an entire new SIR screening information request. Right. And the language about graphics, illustrations, and charts showed up in the first amended version of that SIR on March 3 of 2017. So, yes, it wasn't there before then. Okay, yes, you're right. You're right. And so the point is, the question is whether or not the FAA was arbitrary and capricious. Look at those exhibits and you tell me whether or not you can discern which is and which is not compliant based on the definitions that have been offered by the FAA. Is Exhibit C, is that one of the exhibits that were deemed compliant or noncompliant? Exhibit C was deemed noncompliant, your honor. All right. Is there a difference in the font size between Exhibit J and Exhibit C? Well, no, I don't want you to go down through the record. I will say, your honor, that based on my review of all the exhibits in both the original and the revised proposals, the text of the exhibits was either 8 point or 10 point versus 12 point in the text. So, if you look at Exhibits I and J, and again, I have copies here if the panel would like to look at those. So, you're saying none of the noncompliance had anything to do with the font size. It only had to do whether it was pictorial or text. Correct. All right. And yet I don't see any pictorial displays on any of the exhibits, including those that were deemed compliant or those that were deemed noncompliant. So, how is that not arbitrary and capricious for them to decide? Well, revisions were made to these in order to respond to the FAA, and something was added, wasn't there? I'm sorry, say that again, your honor. Was something added to these exhibits after the FAA said they were noncompliant? Yes, we added color and we moved them into boxes and attempted to make them more consistent with what might be deemed. Did you add any pictures or charts? We did not add pictures. What did you add? What was formerly in bullets was now divided into separate boxes for labeling purposes and for. . . And you added some background, right? Some background color, yes, your honor. So, it's still text, but it's just text in boxes? Correct. So, why don't you have to comply with the font size if it's text? But that's the same for the text that's in the boxes that the FAA has said are compliant. I can't discern the difference between the ones that are and are not compliant. Okay. And how is that not arbitrary and capricious for the FAA to say to my client that you can no longer participate in this bidding process based on a willy-nilly decision of what is and what is not compliant? So, to be clear, when you put text in the boxes, then they became noncompliant? It was noncompliant according to the FAA, yes, before and after, yes. And after. Correct. But the font size remained the same. Yes. So, if it was noncompliant before because of font, why wouldn't it still be noncompliant? Because my client was attempting to make them into graphics, illustrations, and charts in order to convey the information that the FAA needed to. So, it gets down to what's the difference between graphic illustrations and charts versus text. Correct. And it's the FAA's position that that distinction is pictorial, and yet you can't apply that definition, that pictorial definition, to the different exhibits in the proposal. And if you'll look at the record on pages, agency record pages 1230 and 1231, that's where the FAA clearly delineates which of the exhibits are compliant and which are not compliant, and I implore you to look at those and decide which ones actually fit the definition of pictorial versus nonpictorial. They're all textual, Your Honor, and I don't understand how the FAA can say that, gee, just because these are, quote, not pictorial and these others are, even though they're all textual, how that is not arbitrary and capricious. And if you don't have any other questions, I'd love to hear the FAA's explanation for why these exhibits are pictorial versus nonpictorial. Thank you. Thank you, Your Honor. May it please the Court. Steven Mager from the United States Department of Justice representing the FAA in this case. I think it's first necessary to clarify a point of what our arguments are and how the FAA distinguished between text and graphics illustrations or charts. Although Council for Leader Communications stated that we merely stated that it's text versus a picture, it was a question, and this is on page 23 of our brief and 1024 of the record, that it was a question of functionality, which is, is the text the same as is the supposed graphic illustrations or chart functionally the same as the surrounding text, or do the decorative or pictorial elements convey substantive information? And just using the two examples they used, and, you know, a lot of, they're very well-picked examples. If you look at most of the exhibits that were rejected as not complying with font size requirement, such as F, G, K, or M, F alone contains in excess of 2,000 words of text with some color added in, clearly not, clearly just simply text, not having really any functional pictorial element. But if we look at just the two examples they use, exhibits I and J, with J they say it was arbitrary and capricious because that was compliant, even though it was over a 12-point font. But if you remove the graphical element from exhibit J, which is on the right-hand side, a series of bullet points, you lose much of the information that's being conveyed there, which is how leader communication intends to comply with various statement of work requirements. So if you remove the pictorial element from that exhibit, you have functionally something that no longer works. The non-textual elements are just as important there as the textual explanation. Compare that with exhibit I, where if that was simply plain text, if you remove the color, if you remove the little bubble that leader communications chose to put there, you would have exactly the same information being conveyed. Yes, there are headers there. They mentioned that they added headers when they revised theirs. Mr. Schvitz says J and I were deemed compliant. No. I was deemed noncompliant and J was deemed compliant. J was compliant? J was compliant. And J is the one that's on the page. Well, let me ask you this. Were nine of the 17 deemed compliant? Yes. I think there's substantial agreement among the parties about what was compliant and what was not. The ones that were deemed noncompliant. It would help if you could respond specifically to the argument that they were confused, because some that were deemed compliant looked a lot like the ones that were noncompliant. Well, again, that argument, I just used there two examples, but the question. Then you're going to have to start over with me, because I didn't understand how you responded. I apologize. Well, focus on the two examples they've used. This is setting aside the majority of the exhibits that are at issue here. But if you turn to Exhibit J, which is at page 85 of the record, Exhibit J has a textual element, a textual explanation, but it also contains a graphical element, which is on the right-hand side. The bullet points? The bullet points. The various points in the chart that make it a chart. Now, if that information was removed, if you removed the bullet points, the graphical chart-type element of that particular exhibit, you no longer have leader communications explaining how they are technically complying with the solicitation. It's different from the surrounding text in how it uses the graphical element to convey information, because the entire purpose of the solicitation is to convey information to the agency. Okay. So it sounds like that if you were starting all over and you looked at J, it would be partially compliant and partially noncompliant. Yes. So doesn't that make it noncompliant? The agency reasonably deemed it compliant and reasonably determined that because the graphical element conveyed information, because that's the entire purpose of the screen information. On the other eight that were deemed compliant, is there something at least tiptoeing up to being a chart, a graph? There are ones that are far more graphical in nature. If you look at Exhibit N, which is at 94 of the record, that's a flowchart. And a flowchart is purely graphical in nature. You know, if you're using a 10-point font size, you're clearly complying with the agency's requirements. But it's in the text, too. In the text. Well, there's a textual component in a flowchart, because you're going to have... So this is one of those others, well, it's kind of, it's got a chart in there, so we'll just let it go and deem it compliant. Well, N is clearly compliant. N is because it's a flowchart. It uses, it's using arrows and the nature of the information being conveyed. So do you look at whether it's mostly text or not? Not simply that. I mean, because if, I mean, you're simply not doing a word count here. It's, again, is the text what is conveying the information? Without the graphical element on any of these, do you have the same information being conveyed? And that's the definition that the FAA used itself, you know, on page 1024 of the record, where they describe the non-compliant material as functionally the same as the surrounding text. The shading, colors, polka dots, or other visual accents added are decorative and convey no substantive information. Are any of the exhibits of the nine compliant, other than N, and you say J, Kind of. Are any of the other non-compliant ones wholly a chart or an illustration like N? Are any of the… Are they wholly a chart or a pictorial representation without any text? Of the compliant ones, no. I don't think any of them use text. I don't think any of them have no text in them whatsoever. I mean, that's why there's… You told me N was completely a flowchart. But a flowchart still has to use text. I mean, it has text. They all have a textual component. That's why there are different font sizes for… I mean, otherwise you wouldn't need a font size exception for graphics, illustrations, and charts. Because you've got a graph, and you've got to say, you know, the states of the union and the years they were admitted to the union, or something like that. You have to have some explanation in the graph. That's what you're saying. Yes. There's a mix. That's it. In a more global sense, could you tell me why somebody would not be confused when they looked at the nine deemed compliant as to what they must do to make the other eight compliant? Well, first, the FAA, that wouldn't be a sort of a source of confusion for them, because the FAA, when it communicated the leader communications, it didn't say, these exhibits are compliant, these exhibits are not compliant. Increase the text. Increase the font size. What the FAA said is it said, leader, we have… you have exhibits. Some of them are noncompliant. Please enlarge the font, you know, as necessary. And they left leader to determine ultimately which ones might need a change in their font size and which ones might not. And there's substantial agreement between the FAA, and, in fact, there's complete agreement between the FAA and leader communications about which exhibits needed some sort of alteration. The ones that FAA deemed noncompliant, C, D, F, G, H, I, K, and M, are the same ones that leader communications added color to and added that sort of almost graphical component to the text of their proposal. So there's agreement in which ones are the problem ones. So your point is, even before you identified those as noncompliant, they knew they were problematic. Yes. And attempted to add color or background or… And especially if you look at their original proposal. I mean, one of the things we note in our brief, that leader communications' interpretation of what is text and what is graphic illustration in the charts would allow them to simply place a box around their text and say, all right, this now needs to only be at a 10-point font size because we put a box around it. Well, if you look at their original proposal, that's pretty much what they did with a number of these noncompliant proposals. They were text, bullet-pointed, smaller font size with a box around it, which is one of the reasons why the FAA went back to them and said we have a concern here. So… And one of the things they complain about is they were told to fix it, not go over the word limit, and not change any wording. Is that possible? Well, it was said they needed to be textually consistent. They did change their wording. I mean, if you look at the very exhibit that they had brought up, Exhibit I, the wording on that compared with the wording on their original exhibit is a little different. They omitted some words. They eliminated some words. So they were required to be textually consistent. But if they were concerned about the page limit, they could have gone back to the contracting officer and raised the issue with them. We're concerned, the contracting officer, that this may ultimately cause us to go over the page limit. Is it permissible to delete text? Can we remove parts of our proposal? Can we eliminate words? They did eliminate words themselves, so they seemed to think that was permissible. They just didn't do it extensively. And part of the problem they have, of course, is because they had so much of their proposal in noncompliant text, when you remove that information, they may not have been able to have a proposal that would otherwise be acceptable. In fact, we know that because the way the FAA evaluated them is they didn't consider the noncompliant exhibit. But counsel was saying that, you know, all of this back and forth could have been helpful, but they were facing a time constraint. Could they have extended the time? They could have asked, but three days in a procurement is a reasonable amount of time. Procurements do tend to move fast and efficiently. So they could have asked, and would their request have been granted ever? I don't know. That didn't happen, so I can't know what would happen. I do know the FAA had its own deadline, so it probably would have required going back to ODRA, saying that one of the offerors has requested additional time, and we would like, you know, to have a week, and for that reason we're going to have to extend our procurement deadline. Since leader communication was the primary driving force behind the accelerated schedule, I think the fact that they were asking for more time would have held great weight with ODRA. Unless the Court has any further questions. Hearing none, thank you. Thank you. So is it true that there was an agreement about which exhibits needed alteration?  I think he was implying that we apparently understood which ones were noncompliant because we happened to amend the exact same ones that they determined three months later were noncompliant. And I was looking at the exhibits in the original and the revised proposals, and all the ones that LCI revised for the revised proposal were all black and white. They had no shading, no coloring, but they did use the little bullet points, little black circles in each to delineate the text. And all of those, LCI converted all of those into what, I guess, exhibits that had colorful background and rearranged the text so that sometimes including a flow chart and that kind of stuff. So when you look at them, you can see, yeah, this is why they picked those particular exhibits to amend, because those were the only ones that didn't have color and, as the FAA seems to suggest, you know, didn't apparently have a functional distinction between the exhibit and the surrounding text. Well, you would admit that you can't take, you just can't take the text of your proposal, and you could put a box around all of your text and throw in some colored background, and you could submit the whole thing in eight point. I agree that we could not do that. Okay. And so the question is, was it reasonable for you to understand, I mean, I look at some of these exhibits, and if somebody did this in a brief trying to get around our font limits, I would be seriously annoyed, and I would think that they are intentionally playing games with our page limits. Sure. I mean, I think some of these exhibits, on their face, you look at them, and it's not, by any reasonable interpretation, a chart or graph. Okay. And I'll give you that, Your Honor, but what about the ones that the FAA has decided are, or do constitute graphics, illustrations, and charts? Well, if it was obvious that some of them violated the fact that they let you skate by generously on others where they said, well, you know, I guess you could say that these bullet points actually advance the argument somewhat. I mean, why does that make it okay to have shoved a bunch of text into boxes and put a polka-dotted background on it and say, okay, we can do it in eight point? I don't know that I have a good answer to that, Your Honor. That's a very good question, but the point is that the FAA cannot be arbitrary and capricious in its determinations, and it eliminated LCI based on this distinction that it has decided to draw between pictorial and non-textual exhibits, and yet I don't see a credible distinction between the two based on the ones that they decided compliant or non-compliant. That's got to be arbitrary and capricious. If that's not, then I don't know what is. Well, you said you had no good answer to Judge McHugh's question. When you look at the eight exhibits that were deemed non-compliant, isn't it patently clear that they are not charts, graphs, or pictorial representations? It's clear that they're not pictorial representations. That's correct. Or charts or graphs. I mean, what's the definition of a chart or a graph? Charts have a lot of text. No, no, you can't ask me a question. Sorry, Your Honor. Okay. You think that you could look at those and they could possibly be charts or graphs? Yeah, I think in certain contexts people can argue that that's a chart or graph because the bullet points draw demarcations between the different subject matters discussed in the exhibits. But they gave you the bullet points. They gave you the bullet points. I'm talking about the ones that were deemed non-compliant. Well, if you give us the bullet point, then every exhibit that they submitted in the original proposal would pass that test because every single one of them had bullet points delineating the text. It was black and white, but it was delineating the text. It's a $75 million question about what's the correct interpretation of graphics, illustrations, and charts. I just don't see how the FAA's definition. Sounds like an easy 75 grand. Thank you, Your Honor. If there are no further questions, I'll sit down. Thank you.